# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**PRINCIPLE SOLUTIONS, LLC,**

        Plaintiff-Counterclaim-Defendant,

          v.

**FEED.ING B.V.,**

        Defendant-Counterclaimant,

and                                             Case No. 13-C-223

**NATURAL BALANCE PET FOODS, INC., and JERRY BALL**,

        Defendants,

---

**FEED.ING. B.V.,**

        Third-Party Plaintiff,

          v.

**KEVIN ZIMMER,**

        Third-Party Defendant.

---

# DECISION AND ORDER

---

    This action arises from a June 28, 2012, contract by Feed.Ing B.V. ("Feed"), a Netherlands business, to sell potato mix for use in the pet food industry to Principle LLC ("Principle"), a Wisconsin business that specializes in sourcing commodities and ingredients for the pet food

industry. Kevin Zimmer ("Zimmer"), the president of Principle, and Sven Gravendeel ("Gravendeel"), the chief executive officer of Feed, negotiated the contract.

International diversity jurisdiction is afforded over Principle's action pursuant to 28 U.S.C. § 1332(a)(3), and over Feed's third-party action against Zimmer pursuant to 28 U.S.C. § 1332(a)(2). This Decision and Order addresses Feed's summary judgment motion and Zimmer's motion to dismiss Feed's Third Amended Third-Party Complaint ("Third-Party Complaint") for failure to state a claim. (ECF Nos. 31, 54.)

## MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Summary judgment should be granted when a party that has had ample time for discovery fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* If the moving party establishes the absence of a genuine issue of material fact, the non-moving party must demonstrate that there is a genuine dispute over the material facts of the case. *Id.* at 323-24. The

Court must accept as true the evidence of the nonmovant and draw all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U..S. 242, 255 (1986). Summary judgment is appropriate only if, on the record as a whole, a rational trier of fact could not find for the non-moving party. *Rogers v. City of Chi.,* 320 F.3d 748, 752 (7th Cir. 2003).

### Relevant Facts[1]

Feed and Principle entered into an initial contract in January 2012 whereby Principle agreed to purchase potato mix from Feed for delivery between February 23 and March 5, 2012. In March 2012, Principle and Feed entered into their second contract when Principle agreed to purchase additional potato mix from Feed for delivery between March 27 and August 20, 2012. Contracts between Feed and Principle were negotiated orally, via email, or by some combination of the two.[2] By June of 2012, Principle had bought 110 container loads of potato mix from Feed.

After taking delivery under the January and March agreements, Principle informed Feed that in order to meet customer specifications it

---

[1] The relevant facts are based on Feed's proposed findings of fact ("PFOF") (ECF No. 34) and Principle's statement of additional facts ("SAF") (ECF No. 47-1) to the extent that they are factual and are undisputed. Principle's response to paragraphs 13,

[2] There is a genuine dispute of fact regarding how the contracts were confirmed and whether Principle ever received a copy of Feed's General Terms and Conditions in relation to any of the parties' contracts. (*See* Principle's Resp. PFOF ¶ 5-8.) However, the dispute of fact is not material.

was blending the Feed potato mix with higher protein. Feed assured Principle that it would correct the low protein levels for future shipments

On June 27, Feed sent Principle an email that stated in relevant part:

> In the last two weeks we looked at the renewal of the potato mix contract and [I] can sum up in short what we can do.

| | |
|---|---|
| Seller. | Feed.Ing bv |
| Buyer. | Principle Solutions |
| Volume. | Max 25 containers per week |
| Period. | August 2012–[J]une 2013 |
| Product. | Potato mix |
| Spec. | Max 11 moisture, min 6 protein |
| Remarks. | All containers will be supplied with a COA stating moisture and protein level. Accompanied will be a viscosity test |
| Delivery. | Delivered US duties paid |
| Price. | Usd 0.485 per pound basis delivery Galva with a correction for the various end. |

(Zimmer Decl. Ex. D.) (ECF No. 48-4.) Principle responded "Sounds good." (*Id.*)

On June 28, Feed and Principle exchanged emails as follows:

> Gravendeel: I have checked all the options . . . and we can quote the earlier mentioned 48.5 cents per pound for all destinations based on *the current*

- 4 -

*spread of shipments per 4 weeks.* . . . The volume is very critical at the moment and we need to make a lot of preparations for this but I think we can do it. . . .

Zimmer: So 28 day terms?

Gravendeel: No, 14 days after arrival in the warehouse.

Zimmer: Ok.

Gravendeel: Ok as in contract confirmed?

Zimmer: Ok.

Gravendeel: Is the contract now confirmed? *For one year based on the volumes mentioned at 48[.]5?*

Zimmer: Can't make 48 work huh?

Gravendeel: Sorry not possible.

Zimmer: Ok fine confirmed.

(Gravendeel Decl. Ex. C.) (ECF No. 33-3.) (Emphasis added.)

On June 29, Feed sent the following confirmation to Principle:

Ermelo, 06/29/2012

Contract 00.160.860

We have the pleasure to confirm the following transaction:

| Seller | Feed.ing b.v |
| Buyer | Principle Solutions |
| Conditions | Sales Conditions Feed.ing b.v. |
| Quantity | 25000 Mt |

| | |
|---|---|
| Delivery | DDP US warehouse as per agreed schedule (Incoterms 2000) |
| Delivery Volume | 19.2 Mt |
| Period | *29-06-2012 - 28-06-2013* |
| Product | Potato mix S bigbags |
| Packaging | Bigbags on pallet(s) |
| GMP | Delivery not according to Dutch GMP-Standards |
| Specification | According to data sheet on www.eyegeye.nl |
| Price | USD 1,069.24 per Mt |
| Payment | 14 days after invoice date |
| Remarks | N.[A]. |

(*Id*. at Ex. D.) (ECF No. 33-4.) (Emphasis added.)

On June 29, Feed informed Principle that it was struggling to secure insurance against international exchange rate fluctuations. This "hedge" was critical to the success of Feed's export business model because its margins were very tight. (Gravendeel Decl. ¶ 7.) (ECF No. 33.) Feed brought the issue to Principle's attention, in part, to provide notice of its rights under the General Terms and Conditions allowing Feed to adjust the price or include additional charges.

In the same email exchange Principle wrote, "I have a signed

agreement from you that I have traded against. If I need to buy product elsewhere—you need to let me know." Feed responded, "[y]ou have my word on the product and the volume . . . I do not want to let you down because I have given my word and that is twhe [sic] only thing that is important to me." (Gravendeel Decl. ¶ 7, Ex. E.) (ECF No. 33-5.)

On or about July 2, Ron Sturn ("Sturn") of Principle sent an email to defendant Jerry Ball ("Ball") claiming that Feed's potato mix had fat and protein contents of about 3% and moisture content of about 11.5%. Ball forwarded the email to Gravendeel and Zimmer. On July 3, Principle replied to Ball and Feed: "The protein has been 3-4% and the moisture 11-12%. We have had to blend up every load of material to make this work in our model. *I'm not complaining*—just letting you [Ball] know what to expect . . ." (Emphasis added.) (Gravendeel Decl. ¶ 9, Ex. G.) (ECF No. 33-7.) In that same email Principle wrote: "[Feed]—where do we stand on the sign[ed] contract you forwarded to me for new crop? The Euro currency is headed back down and again in my opinion it will hit parity with the US$ before [it] goes to $1.50." (*Id.*)

In about August 2012, Principle's inventory of potato mix began to grow. The demand Principle had speculated on slowed down or did not materialize, and it faced greater competition in the marketplace which

further reduced demand for its potato mix.

On August 6, Principle wrote to Feed:

> You are going to have to make some change somewhere. I will have a better idea later today on my positions when [Sturn] can confirm each location. This is why I mentioned to you that this sort of model needs to have a feed release for when we get long. Also, the Euro is now back up at or higher to when you hedged, you should be able to trade a portion of it back- possibly at a profit, I need to get my inventories back in check, as I mentioned [Sturn] in my office will help me manage this shipping schedule better, *Unfortunately, I was intentionally running long since historically things get tight between crops and . . . it made sense.* As well [I] had gotten indication that Natural Balance was going to use 3-4 t[i]mes more product than they are at the moment. Put the competition pressure along with customers swapping out of potato for garbs, peas & lentils, demands for US production, slower orders - a perfect storm has brewed. *We [were] also staying ahead because we are eager to finish this high priced contract, but in the end it's killing having to tie up capital on inventory and with the added cost of blending your protein up we are losing a nickel per lb on every lb we buy from you, and have from the start.* Borrowing money to lose hundreds of thousands is not a good business plan. A few weeks of heavier orders can change a lot. I don't suspect to see an increase now until after Labor Day here in the states though. This is still a month away. Once [Sturn] has a better handle on the time in transit and what we already own we can put some more orders in here soon.

(Zimmer Decl. Ex. G.) (ECF No. 48-7.) (Emphasis added.) Feed responded:

I have no problem sticking together but I can not simply turn off the machines and stop producing. We are coming from a volume of 30 boxes per week and than [sic] from one day to another you ask us to stop shipping. Right now we have not shipped anything for two weeks and that is something we can not handle. Apart from the storage, the shipping lines where we have to book space I have the exchange risk, lf I do not deliver dollars against the exchange contracts I lose 10.000 dollar per week based on todays exchange rate.

(*Id.*)

Between August 2012 and March 2013, Feed delivered and Principle accepted 3,046.58 metric tons of potato mix in 44 shipments. Feed had committed significant resources and "tooled up" to supply Principle with the contracted quantities (Gravendeel Decl. ¶ 11) and refused to supply potato mix to other customers, all in reliance on its contract with Principle. From August through December of 2012, Principle took minimal deliveries. Meanwhile, Feed did what was commercially feasible to accommodate Principle's slow consumption rate. Feed incurred storage charges exceeding $954,000 for storing potato mix that it purchased in reliance on the June contract. Feed lost profits in the amount of $11,380,800.

## Analysis

Feed seeks summary judgment on its breach of contract counterclaim against Principle for its failure to purchase the remaining

21,967 metric tons of the potato mix under the June contract, and summary judgment dismissing Principle's breach of contract claim for allegedly inferior product because quality was never part of the contract and Principle failed to properly reject the goods.

Principle agrees that a June contract exists because it had a meeting of the minds with Feed for the purchase of 25 containers of potato mix at 48.5 cents per pound over four weeks, but argues that almost every other fact is disputed precluding Feed from obtaining summary judgment. Principle contends that part of the reason it did not order the anticipated amount of potato mix is because Feed had previously breached the agreement by supplying deficient potato mix, and therefore summary judgment should be granted in Principle's favor. Principle also states that its attempt to mitigate damages and perform for its customers was reasonable and defeats Feed's waiver argument. Principle also points out that Feed's motion does not address Principle's conspiracy claim against it.

In reply, Feed asserts that the only issue is whether the one-year term of the contract was ambiguous such that extrinsic evidence could be considered. And with respect to Principle, the only issue is whether it waived or is barred from bringing its quality claims now.

Principle and Feed are in apparent agreement that the substantive

law of Wisconsin applies to their dispute. Under these circumstances, this Court must apply Wisconsin law as enunciated by the highest state court or otherwise by the intermediate appellate courts of the state. *See Kutsugeras v. AVCO Corp.,* 973 F.2d 1341, 1346 (7th Cir. 1992); *see also Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938).

Contract interpretation presents a question of law. *Estate of Kriefall v. Sizzler USA Franchise, Inc.,* 342 Wis. 2d 29, 47-48, 816 N.W.2d 853, 862 (Wis. 2012). Wisconsin courts construe contracts to determine and give effect to the intentions of the parties. *Id.* Parties are presumed to express their intentions in the language of the contract. *Id.* "Where the language of a contract is unambiguous and the parties' intentions can be ascertained from the face of the contract, [the courts] give effect to the language they employed." *Id.* The interpretation of contracts involving a transaction in goods also may be affected by provisions of the Wisconsin UCC, Wis. Stat. ch. 402. *See id.*

The parties are merchants because they deal in the goods in question. *See* Wis. Stat. § 402.104(3). Thus, the UCC affects the parties' obligations with respect to the sale and purchase of the potato mix. *See* Wis. Stat. § 402.102. Section 401.103(2), Wis. Stats., specifically states that common law principles of law and equity "supplement" the UCC

"[u]nless displaced by the particular provisions of [Wis. Stat.] chs. 401 to 411."

Because the contract between the parties was for the sale of goods in excess of $500, Wis. Stat. § 402.201 is applicable, and it provides:

> (1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made *between the parties and signed by the party against whom enforcement is sought or by the party's authorized agent or broker.* A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this subsection beyond the quantity of goods shown in such writing.

> *(2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of sub. (1) against such party unless written notice of objection to its contents is given within 10 days after it is received.*

> (3) A contract which does not satisfy the requirements of sub. (1) but which is valid in other respects is enforceable:

> (a) If the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial

> beginning of their manufacture or commitments for their procurement; or
>
> (b) If the party against whom enforcement is sought admits in that party's pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this paragraph beyond the quantity of goods admitted; or
>
> (c) With respect to goods for which payment has been made and accepted or which have been received and accepted (s. 402.606).

(Emphasis added.)

There is a writing sufficient to show that a contract for sale was made. Neither party signed the contract, however the parties agree they formed a contract. Thus it is enforceable. *See* Wis. Stat. § 401.201(3)(b).[3]

Feed and Principle disagree on the terms of the June contract, however the interpretation of a contract is a question of law for the Court. *See Estate of Kriefall*, 816 N.W.2d at 862. Principle contends that it agreed to purchase 25 containers of potato mix per week for four weeks at 48.5 cents per pound. However Feed stated, "we can quote the earlier mentioned 48.5 cents per pound for all destinations based on *the current*

---

[3] Although not argued by the parties, the UETA, *see* Wis. Stats. §§ 137.11-137.26, authorizes parties "to agree" to conduct transactions by e-mail and directs courts determining whether parties have so agreed to consider the "surrounding circumstances, including the parties' conduct." § 137.13(2). If the parties have agreed to do business electronically, an electronic signature will constitute the signature required by the UCC's statute of frauds. Wis. Stat. § 137.15(4). *Alliance Laundry Sys., LLC v. Thyssenkrupp Materials, NA,* 570 F. Supp. 2d 1061, 1068 (E.D. Wis. 2008)

*spread of shipments per 4 weeks*." When read in context the phrase does not support Principle's contention that the contract was a four-week contract. The plain words of the contract refer to "spread of shipments per 4 weeks," not shipments over a period of four weeks. Moreover, the purported four-week contract is contrary to Principle's June 28 response, "ok fine confirmed," to Feed's inquiry as to whether the contract was confirmed for one year based on the volumes mentioned at 48.5. The one-year duration of the June contract is not ambiguous.

Additionally § 402.207, Wis. Stat., provides:

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
>
> (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless: (a) The offer expressly limits acceptance to the terms of the offer; (b) They materially alter it; or (c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
>
> (3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract

consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of chs. 401 to 411.

Feed sent written confirmation of the contract on June 29. It states that the duration of the contract is from June 29, 2012 through June 28, 2013—a one-year period—and that Principle will buy 25,000 metric tons of potato mix from Feed over that time period which will be delivered in 19.5 metric ton amounts, with payments of $1,069.24 per metric ton due 14 days after invoice date. The confirmation agreement from Feed is also unambiguous. Thus the contract is enforceable against Principle because there is no evidence upon which a reasonable jury could find that Principle objected to the contract within 10 days of receipt of the June 29 confirmation. *See* Wis. Stat. § 401.201(2).

The next issue is quality. Feed asserts that Principle waived its right to pursue a breach of the agreement on quality under the UCC and common law, and its claim is also barred by its Terms and Conditions which apply to the June contract as a matter of law.

Section 402.602, Wis. Stats., provides:

> (1) *Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller.*

> (2) Subject to ss. 402.603 and 402.604 on rejected

goods: (a) After rejection any exercise of ownership by the buyer with respect to any commercial unit is wrongful as against the seller; and (b) If the buyer has before rejection taken physical possession of goods in which the buyer does not have a security interest under s. 402.711(3), the buyer is under a duty after rejection to hold them with reasonable care at the seller's disposition for a time sufficient to permit the seller to remove them; but (c) The buyer has no further obligations with regard to goods rightfully rejected.

(3) The seller's rights with respect to goods wrongfully rejected are governed by s. 402.703 on seller's remedies in general.

(Emphasis added.)

Section 402.605, Wis. Stats., provides:

(1) *The buyer's failure to state in connection with rejection a particular defect which is ascertainable by reasonable inspection precludes the buyer from relying on the unstated defect to justify rejection or to establish breach:*

*(a) Where the seller could have cured it if stated seasonably;* or

(b) Between merchants when the seller has after rejection made a request in writing for a full and final written statement of all defects on which the buyer proposes to rely.

(2) Payment against documents made without reservation of rights precludes recovery of the payment for defects apparent in the documents.

(Emphasis added.) The facts before the Court disclose that despite

Principle's complaints about protein content and moisture, it used the

potato mix and paid the invoices. Furthermore, despite construing the evidence in the light most favorable to Principle, there are insufficient facts upon which a reasonable jury could find that Principle seasonably rejected the potato mix.

Feed has submitted sufficient proof of its damages: lost profits of $11,0380,800 plus $954,000 in storage fees, which have not been disputed by Principle. Therefore, the Court grants Feed's motion for summary judgment on its breach of contract counterclaim against Principle for failure to purchase the remainder of the product mix under a one-year supply contract and dismissing Principle's breach of contract claim based on allegedly inferior product Principle has not presented any evidence upon which a reasonable jury could find that it rejected the goods.

### Zimmer's Motion to Dismiss Third-Party Complaint

Zimmer contends that Feed's claims pleading alter ego liability should be dismissed because the Third-Party Complaint does not contain sufficient facts to justify piercing the corporate veil warranting dismissal of the breach of contract and alter ego liability. (First and Second Claims). He also maintains that to the extent that Feed's claims for intentional and negligent misrepresentation (Third and Fourth Claims) seek to recover in tort for claims arising out of the contract, they are barred by the economic

loss doctrine.

For a complaint to withstand a Rule 12(b)(6) motion, a claimant is required to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2)  The pleading must include more than mere legal conclusions or a recitation of the cause of action elements, but does not require detailed factual allegations. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).  The pleading must meet a plausibility threshold; mere possibility is not enough.  *Id.* at 570. Plausibility means there are enough facts in the complaint for a reviewing court to draw a reasonable inference that the pleader is entitled to relief. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  However, the Court need not accept as true its legal conclusions; "[t]hreadbare recitals of a cause of action's elements, supported by mere conclusory statements," do not suffice." *See id.* at 663 (citing *Twombly,* 550 U.S. at 555).

Even after *Twombly*, courts must still approach motions under Rule 12(b)(6) by "constru[ing] the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in her favor." *Tamayo v. Blagojevich,* 526 F.3d 1074, 1081 (7th Cir. 2008).  This threshold requires a court to utilize its judicial experience and common sense within the context of the facts to determine

whether the pleading meets the plausibility standard. *Iqbal,* 556 U.S. at 679.

*Consumer's Co-op of Walworth Cnty. v. Olsen*, 142 Wis. 2d 465, 484, 419 N.W.2d 211, 217-18 (Wis. 1988), states that there are three elements to establish alter-ego liability: (1) complete dominating control not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity to the transaction had at the time no separate mind, will or existence of its own, (2) such control was used to commit a fraud, wrong, dishonest or unjust act against plaintiff's legal rights, (3) which causes injury or unjust loss complained of.

The Third-Party Complaint alleges that Zimmer and Principle have no separate existence because Zimmer comingled funds or assets with Principle, failed to segregate funds of Principle, diverted company funds or assets for other than corporate uses, treated Principle's assets as his own, failed to maintain formalities to be observed by limited liability companies, failed to adequately capitalize Principle with unencumbered capital both at inception and when it took on substantially greater liabilities and risk, and/or treated Principle's assets and employees as his own. (Third-Party Compl. ¶ 23.) (ECF No. 46.) These threadbare recitals of the first element for alter ego liability are fleshed out with the following factual allegations.

Specifically, Feed alleges that on March 19, 2007, when Principle obtained limited liability company status, Zimmer placed virtually no at-risk capital in the corporation. As of May 31, 2007, Principle's bank account had a balance of only $5,965.26 and, consequently, its ability to pay debts as they became due was extremely compromised, with its bank account dipping to a balance of $3,000 or under at least six times during its first year of business. (*Id.* at ¶ 24.) Prior to October 14, 2009, Zimmer engaged in fraud by paying his girlfriend instead of himself so he could declare less money. Principle's bank records also show that in numerous instances Zimmer withdrew money from Principle when his personal bank account had less than $1,000 only to have the exact same amount deposited to Principle's account a short time later. Zimmer also made a practice of using Principle's funds to pay for personal expenses such as his personal cell phone. (*Id.* at ¶25.)

However the three elements of *Consumer's Co-op,* 419 N.W.2d at 220-21, emphasize the need to connect the alleged wrongdoing with the plaintiff's alleged injury. Despite construing Feed's factual allegations and the reasonable inferences from those facts in the light most favorable to Feed, it has not alleged sufficient facts to establish a plausible claim for alter ego liability because its alleged injury in 2012 is not adequately

connected with Zimmer's alleged control of Principle in 2007 and prior to October 14, 2009. The second claim does not sufficiently allege a basis for alter ego liability. Consequently, the first claim for breach of contract which is predicated on Zimmer's alter ego liability also fails to state a claim for relief.

*Kaloti Enterprises, Inc. v. Kellogg Sales Co.* 283 Wis. 2d 555, 580, 699 N.W.2d 205, 216 (Wis. 2005), explains that economic loss results from "a product failing in its intended use . . . or failing to live up to a contracting party's expectations." (Citations omitted). "The economic loss doctrine is 'based on an understanding that contract law and the law of warranty, in particular, is better suited than tort law for dealing with purely economic loss in the commercial arena.'" *Id.* (Citations omitted). The fraud in the inducement exception applies to economic losses when: (1) the claimant can establish the five elements of a fraudulent misrepresentation;[4] (2) the fraudulent misrepresentation occurred before

---

[4] To state a claim for intentional misrepresentation under Wisconsin law, the following allegations must be made:

> (1) the defendant made a factual representation; (2) which was untrue; (3) the defendant either made the representation knowing it was untrue or made it recklessly without caring whether it was true or false; (4) the defendant made the representation with intent to defraud and to induce another to act upon it; and (5) the plaintiff believed the statement to be true and relied on it to his/her detriment.

the contract was formed; and (3) the fraudulent misrepresentation was "extraneous to" rather than interwoven with the contract. *Id.* at 219 (citing *Digicorp, Inc. v. Ameritech Corp.,* 262 Wis. 2d 32, ¶ 52, 662 N.W.2d 652, 663 (Wis. 2003)). As to fraud that is "interwoven," "the misrepresentations relate to the breaching party's performance of the contract and do not give rise to an independent cause of action in tort." *Id.* at 217 (Citation omitted).

The crux of Feed's misrepresentation claims against Zimmer is that on at least June 28, 29, and July 3, 2012, Zimmer represented that Principle would accept delivery of and pay for the potato mix under the contract (Third-Party Compl. ¶¶ 33-34), but Principle and Zimmer had no intention of performing their obligations under the contract—their only intention was to treat it as an options contract to hold against Feed if the market price of potato mix continued at or above the level Feed had bound itself to. (*Id.* at ¶ 36.) Principle and Zimmer failed to disclose that they were relying on market speculation, which was a material fact that would have affected Feed's decision to enter into the contract. (*Id. at* ¶ *35.*)

---

*Kaloti Enters.,* 699 N.W.2d at 211. An intentional misrepresentation claim may arise either from a "failure to disclose a material fact" or from a "statement of a material fact which is untrue." *Id.*

The Third-Party Complaint does not allege that Zimmer intended to treat the contract as an options contract *before* the contract was formed. Moreover, the intent to treat the contract as an options contract rather than a supply contract for the purchase 25,000 metric tons of potato mix over the one-year contract period is not extraneous to the contract. It is interwoven with Principle's agreement to perform under the terms of the contract. *See Kaloti Enters., Inc.,* 699 N.W.2d at 217.

This case is distinguishable from *Kaloti* which involved a Kellogg agent who, knowing that Kellogg had changed its business model by selling its products directly to large market retailers, solicited and obtained an order from a wholesaler knowing that the wholesaler bought products from Kellogg in order to resell them to these same large stores and would not have placed the order if it had known that Kellogg was going to sell directly. The information withheld from the wholesaler was extraneous to the contract and fell within the exception to the economic loss doctrine. Zimmer's alleged intent not to perform according to the terms of the contract is not extraneous to the contract, and therefore Feed's misrepresentation claims (Third and Fourth Claims) are also dismissed as barred by the economic loss doctrine. Zimmer's motion to dismiss the Third-Party Complaint is granted and Zimmer is dismissed from this

action.

## Summary

This Decision and Order grants relief to Feed on its breach of contract counterclaim against Principle, and dismisses Principle's breach of contract claim against Feed. It dismisses the Third-Party Complaint, and Zimmer is no longer a party to this action. The conspiracy claim of the Second Amended Complaint remains pending against Feed; and Natural Balance Pet Foods and Ball remain defendants in the action.

At this juncture, the Court will conduct a telephonic scheduling conference. The purpose of the conference call is to establish a scheduling order which will limit the time:

1.     to join other parties and to amend the pleadings;

2.     to file motions; and

3.     to complete discovery;

The scheduling order may also:

4.     modify the timing for disclosure under Rules 26(a) and 26(e)(1) and of the extent of discovery to be permitted;

5.     provide for the disclosure or discovery of electronically stored information;

6.     include any agreements the parties reach for asserting claims of privilege or protection as trial preparation material after information is produced;

7.  the date or dates for conferences before trial, a final pretrial conference, and trial; and

8.  any other matters appropriate in the circumstances of the case.

The time limitations set forth in the scheduling order may only be modified for good cause and with the Court's consent. Fed. R. Civ. P. 16(b)(4).

The parties should be prepared to discuss the matters listed in Civil Local Rule 16(a)(1). Please refer to Attachment A. Special attention should also be given to Rule 26(f)(1), which requires the parties to conduct a settlement/discovery conference at least 21 days prior to the initial scheduling conference described above. The Rule 26(f) conference may be conducted by telephone. Rules 26(f)(2) and (3) mandate that the parties, within fourteen (14) days of their conference: (1) file a written report outlining the proposed discovery plan they have developed at their Rule 26(f) conference; and (2) make the required initial disclosures under Rule 26(a) regarding witnesses and documents. In addition to the matters specified in Rules 26(f)(2) and (3), the Court requests that the proposed discovery plan submitted by the parties include one or two sentences stating the nature of the case. The written report must include the

telephone numbers where the parties can be reached for this call.

In addition, this Court is participating in the Seventh Circuit Electronic Discovery Pilot Program and has adopted the Principles Relating to the Discovery of Electronically Stored Information. Counsel should be fully prepared to discuss methods and techniques to accomplish cooperative fact-finding in their case at the initial status conference. Before the initial status conference, counsel must also meet and discuss the Principles Relating to the Discovery of Electronically Stored Information. At the initial status conference, counsel must be prepared to discuss what agreements they have reached regarding discovery of Electronically Stored Information ("ESI") and what area of disagreement they have with regard to discovery of ESI. After discussing the matter with counsel, the Court will determine whether to enter the Standing Order Relating to the Discovery of Electronically Stored Information in their particular case. (Please refer to Attachments B & C).

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

Feed's motion for summary judgment (ECF No. 31) on its breach of contract counterclaim and dismissing Principle's breach of contract claim is **GRANTED**;

Zimmer's motion to dismiss the Third Party Complaint (ECF No. 54) is **GRANTED,** and Zimmer is **DISMISSED** from this action;

The parties must participate in a telephonic scheduling conference to be conducted on November 12, 2014 at 9:30 a.m. (Central Time). The Court will initiate the call.

Dated at Milwaukee, Wisconsin, this 30th day of September, 2014.

**BY THE COURT:**

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**